MARY J. VALENTINE v. JOSEPH R. TANTUM.

*Married Woman—Action for Services.*

A married woman cannot recover for services rendered to her husband's employer, said husband having previously contracted for the services of his family and himself and said married woman's services having been rendered while living with her husband.

(*New Castle, December 22, 1886.*)

ACTION OF ASSUMPSIT.

Narr with common indebitatus count and a count on a special and express promise to the following effect: That the defendant agreed at the request of the plaintiff to purchase the stock and farming utensils and other goods sold at a constable's sale of her husband's property and to sell the property purchased to her at the price paid at said sale, the plaintiff and her husband to become the tenants of the defendant, who was to lease the farm then occupied by them, and she agreeing on her part to pay for said goods and chattels so sold to her by her own work and labor on said farm, and by any other means in her power.

Mary J. Valentine, testified that she lived on Mr. du Pont's farm in Brandywine hundred in November, 1875, when the property of my husband was sold at constable's sale on execution

process, consisting of farming stock, corn, hay, wheat in the ground, oats, turnips, chickens, wagons, carts, mowing machine, cultivator, hay rake, ploughs, harness, household furniture, etc. There were as many as two hundred and fifty people at the sale I should think. The defendant also was there and bought all of the things for the sum of four hundred and fifty dollars. We continued on the farm four years after that and furnished twice a week during that time to the defendant at his house in Wilmington, farm products such as butter, eggs, poultry, sausages, etc., amounting in value to as high as three dollars per week. During that four years I never received a cent from the defendant for any thing I furnished him, or for any service I rendered him, the latter I think was worth seven dollars per week. Before the sale I went to Dr. Tantum and told him we were going to be sold out, and I wanted him to buy the property in for me and I would pay him for it. I cannot repeat his answer, but it was satisfactory and often after the sale in talking with him about my affairs he would speak of the property as mine and encourage me with the manner in which I was getting along and my prospects of success.

On cross-examination: It was a few days before the sale I went to see Dr. Tantum. I did not say to him at the first interview, when I applied to him to buy in the property for me at the sale, that there was a thousand dollars coming to me from down the country, and when I received it I would pay him for the property. I kept no account, after the first few months, of the articles I delivered to him from time to time in payment for it, or of the services rendered him. He said to me at one time, " You have a nice little stock around you." I do not know that after the sale Dr. Tantum and my husband entered into an agreement about the place and property. I knew Dr. Tantum had rented the farm of Mr. du Pont, but I did not know that he had an agreement with my husband to carry it on for him. I once heard the Dr. say that my husband was running behind on the farm, and he would have to sell out, but he came out in a day or two afterwards and contradicted it.

Thomas Hinkinson testified: I attended the sale and saw Dr. Tantum there, and after the conditions of the sale were made, I

saw him step out and heard him say to the company there met, some two hundred and fifty persons, " Gentlemen, I wish it to be understood, that any thing I may buy at this sale, I shall buy for Mrs. Valentine." It had the effect to cause the goods to sell for considerable less than they otherwise would, I think.

William W. Pritchett testified: I was the constable who made the sale, the aggregate amount of it was four hundred and fifty dollars. The things sold below their value and sold very low. They were worth six or seven hundred dollars. Dr. Tantum bought almost all that was sold. Two hundred dollars worth of the goods were exempt and set off to Mr. Valentine, the defendant in the execution.

Wesley Husbands testified: Was at the sale and heard Dr. Tantum say three or four times during the sale that he was buying the goods for Mrs. Valentine. Very few other persons bid at the sale, and it was generally supposed that he was going to give them to Mrs. Valentine. I think the goods he bought were worth eight hundred dollars.

George Dining testified : I bought the property on the place where Mr. and Mrs. Valentine left it, and gave one thousand and seventy two dollars and fifty-two cents, and paid it to Dr. Tantum. I succeeded Mr. Valentine in the possession of the farm, and by contract, made December 16, 1879, with Dr. Tantum I bought the articles mentioned at the aggregate price before stated.

William W. Pritchett was recalled and produced and proved the appraisement made by him when he levied the execution on them.

Mrs. Valentine was recalled and testified that she had no contract with Dr. Tantum for carrying on the farm.

*Charles B. Lore,* for the defendant, moved a non-suit on the grounds that there was no evidence of money had and received by the defendant to and for the use of the plaintiff. Nor is there any evidence that the plaintiff had any contract with the defendant for

carrying on, or doing any work on the farm. Nor was any work which she performed on the farm done for the defendant, but for her husband, or his and her family, and she could not recover for such services under the third section of the statute in regard to the rights of married women.

THE COURT refused the motion.

Dr. France testified.
Counsel for defendant produced and prosposed to prove by this witness a written agreement between Joseph R. Tantum and Isaac E. Valentine made July 5, 1876, and offers it in evidence.

*Levi C. Bird,* for the plaintiff, objected to its admission and contended that nothing done or said or agreed to by her husband, after the sale of the goods, in regard to the possession of the farm and the carrying on of it, without the knowledge and consent of the plaintiff, could be admissible in evidence against her in this action.

*Lore,* replies.
The Court admitted the agreement in evidence for the possession of the premises for the year 1876, and also for each of the years of 1877, 1878 and 1879.

Joseph R. Tantum testified: First Mr. Valentine came to me and told me he was about to be sold out, and wanted me to help him, and soon after Mrs. Valentine came to see me and was in great trouble and distress and wanted me to attend the sale and buy the goods for her, telling me that she had a thousand dollars coming to her from a relation in Kent County, in the hands of Mr. Smither's and when she got it I should be paid for them. I consented and attended the sale and bought the goods in my own name but publicly stated before doing so that I was buying them for Mrs. Valentine. I gave more money for them than I received for the same goods when I sold them afterwards. I kept a true account of the butter and eggs, etc., delivered to my family from the farm from time to time and which were delivered by Mr. Valentine. Had a settlement with Mr. Valentine on the twenty-fifth day of September, 1877, and have his receipt of that date for

eleven dollars, the balance due and paid to him on that settlement.

Receipt produced, proved and put in evidence and proved by items that about seven hundred dollars worth of goods were added to the stock of goods bought at the constable's sale before he afterward sold the goods to Mr. Dining.

When I found I had lost a thousand dollars and was losing money continually under the agreement, and told Mr. Valentine I would have to terminate it and he would have to leave the farm, he flew into a passion and swore that he would not leave it, and said that I could not put him off, nor should I come on the farm.

Percy L. Tantum testified: Was present in my father's office the first time Mrs. Valentine came to him about buying their goods. She was crying, and when I went in I heard her say if he would buy them she would pay him as soon as she got some money that was coming to her from down the State. My father asked her when she would get it, and she said in a few weeks.

Adam C. Benson testified: Lived with the defendant as a servant during the four years, and was sent out by him in the fall of 1879 to Mr. Valentine's to get a mare that was on the farm. He would not let me have it and said " he be damned if he (Dr. Tantum) should have it," and that he wanted to get his (Valentine) mare away from him.

Dr. Tantum was recalled and testified that during the time the Valentines lived on the farm he made no objections to them using all the products of the farm they needed for their subsistence.

*Levi C. Bird,* for the plaintiff, asked the Court to charge the jury: That although the plaintiff was living with her husband engaged with him in carrying on the farm for the defendant; yet if there was a contract express or implied existing between the plaintiff and defendant, growing out of sale of the stock, and the purchase of the stock by the defendant for the plaintiff, such contract will entitle her to recover at law for work and labor, in her own name under the act for the protection of woman in this State.

*Charles B. Lore,* for the defendant, asks the Court to charge the jury on the following points:

1. The property claimed as exempt cannot be taken into consideration in this cause. It was set off as the property of I. E. Valentine, the husband of the plaintiff, and whatever disposition may have been made of it, the defendant would be responsible to I. E. Valentine and not to the plaintiff.

2. The plaintiff cannot recover for work and labor and at the same time claim to recover for the products of that work and labor.

3. While the law will imply a contract where valuable services are rendered by one which are accepted by another under the particular circumstances, yet where a husband and wife are living together, and the husband as the head of the family is contracting for the labor of said family, the law will not imply a separate and distinct contract for the services of the wife in the absence of any distinct and express contract in relation thereto.

COMEGYS, C. J., charging the jury:

GENTLEMEN OF THE JURY:—This is one of the few cases which have arisen under the legislation which, for brevity, we call "the married woman's act." None of them have yet been reported, on account of their recent occurrenc. This action is by a married woman, and her husband is no party to it. This, no doubt, appears strange to some if not the most of you: it is, therefore, proper that I should charge you with respect to that legislation, in order that you may understand how the action before us, or rather how it is that a suit can be brought in this Court by a married woman at all. This renders necessary a brief exposition of the law of husband and wife, before the married woman enactments were passed.

By the law which, down to the year 1865, always prevailed in this State, and which as part of the ancient common law our English forefathers brought with them to America, as a juridical system for the government of their private affairs, husband and wife were as one person—the act of marriage for most civil purposes merging her existence in his. As a consequence of this, all such property as was of a movable nature, what we usually call goods

and chattels, including money, immediately became his, without any act on his part to obtain actual possession of it. So that, if he died instantly upon the completion of the marriage ceremony, it would have passed to his personal representatives, that is his executor or administrator, to be administered as part of his estate or assets. Another consequence was, that every right in action of hers for the recovery of money payable to her, became his also; but in the case of such, in a qualified sense. That is to say, he had the right to sue for and collect the money secured by it, or payable without any writing, and apply it to his own use. The action at law for this had to be in the name of his wife as well as himself, because it was in her right. In such case, if the money recovered was not, either paid voluntarily to the husband in his lifetime, or such result had not been reached by process issued by him, or his attaching creditors, as to operate what is called a reduction into possession of the fund, she surviving became solely entitled to it. If he survived her, however, he having the right to administer on her estate, became entitled to it as her administrator; and as the sole distributee of her estate, the absolute ownership devolved upon him, subject to the payment of her debts—which the marriage shifted from her to him, but conditionally; that is, that judgment was recovered against him for them in her lifetime.

As by the common law, the separate legal existence of the wife was merged civilly in that of her husband, it necessarily resulted that she could not make any contracts: for if her property became that of her husband upon the marriage, and any she acquired became his also, which it did legally also, there being nothing to contract about on her part, there was no necessity for the existence of the power; and, as in nature where there is no use for a faculty, it does not exist, so in the case of a married woman, there being no use for a power to contract, no power existed. I am speaking of an independent power on her part. If her husband gave her authority, either expressly, or by inference, she could, as his agent, make a contract that would bind him—but none that would hold her.

This condition of things was considered not to be in general harmony with the common law, which is in the main a humane as well as a wise code, and it stood much in the way of just provis-

ions for the independent sustenance of the wife, which her friends might wish to make. Accordingly there grew up, with the expansion of the equity administration of the chancery, a rule of that Court, that where property of any kind was limited, by any species of legal conveyance, in such terms as clearly showed that it was to be her's alone, and not in any respect his, it should be so treated and considered; and that with respect to it, she should be treated as any single woman, and might sue in that Court for it upon contracts made by her in relation to it, or otherwise—all without the use of the name or the agency of her husband. If the property had been limited to a person as trustee, the proceedings would be in her name, or in the name of a next friend where there was no trustee. The trustee might also sue as such in a Court of law, because the legal title would be in him.

The law thus continued in this State until the year 1865, when the legislature initiated the legislation I have before referred to. This was by the act entitled "An Act for the benefit of married women," to be found on page 478 of the Revised Code. It is in these words:

"SECTION 1. That the real estate, mortgages, stocks and silver plate belonging to any married woman at the time of her marriage, or to which she may become entitled at any time, during her coverture, shall remain and continue to be her sole and separate property, and shall not be subject to the disposition of her husband by alienation, transfer, assignment or otherwise; or be liable to the debts or contracts of her husband, except where such debts are judgments recovered against him for her liabilities before marriage: *Provided*, That nothing in this section shall be construed to authorize the wife to sell or otherwise dispose of her real estate, mortgages, stocks or silver plate without her husband's consent, evidenced by writing under his hand and seal, or to authorize her to create any incumbrance upon her real estate, or to dispose of the rents, issues and profits thereof, or the interest upon her mortgages or dividends or other income arising from her stocks, without his consent evidenced in the same manner; And *Provided further*, That nothing herein contained shall be construed to affect, in any manner, the rights of the husband (if he survive the wife), as tenant by the courtesy in the real estate of his wife.

" Sec. 2. That if the money secured to be paid by any mortgage or mortgages belonging to any married woman shall be paid during her coverture, or if with the consent of her husband as aforesaid she shall dispose of her real estate or stock, she may, with the consent of her husband, as aforesaid, invest in her own name the money so paid upon her mortgages, or arising from the sale of her real estate or stock, in other real estate or in stocks, or loan the same on mortgage or mortgages, and such investment or loan shall be her sole and separate property and subject to all the provisions of Section 1 of this act.

" Sec. 3. That all laws and parts of laws of this State inconsistent with the provisions of this act be and the same are hereby repealed, made null and void.

" *Passed at Dover, March 17, 1865.*"

The object of this act was, to put the real estate, mortgages, stocks and silver plate of the wife out of the power or control of the husband, or the reach of his creditors; in other words, it was to make those species of property hers separately, the same as they would be in equity if they had been limited by deed or will for her exclusive use. But all the incidents of separate property in equity were not allowed to attend the operation of the statute; as is shown by the two provisos to the first section. The second section is also restrictive of the meaning and effect of *separate* property, as I have already explained such meaning. The chief purpose of this act seems to have been what I have intimated—to secure a married woman's real estate and her mortgages, stocks and plate against her husband's interference, or that of his creditors; the rents of the former, to which but for the act he would be entitled, being protected from him and attachment by his creditors, as the other subjects of property were.

In 1871 the next act was passed. It provided as follows:

" AN ACT TO SECURE TO MARRIED WOMEN CERTAIN OF THEIR OWN EARNINGS."

" Section 1. That money or other property held or acquired by a married woman, living separate from and not supported by her husband, and which has been kept separate from and can be distinguished from the money or property of the husband, shall not

be deemed his property or taken for his debts so long as they shall live separate and he fail to support her in whole or in part; but such property may be taken for debts and liabilities contracted or incurred by such married woman whilst so living apart from her husband, and for the recovery thereof she may, whilst her separation continues, be sued as a single woman, and may sue in her own name and for her own use for debts contracted and liabilities incurred to her. For her indebtedness and liabilities, contracted or incurred whilst living separate from him without his default, he shall not be liable, otherwise he shall be responsible for them to the same extent that he is now responsible by law. In case they again cohabit, he shall be responsible for all her debts and liabilities contracted or incurred during such separation.

"*Passed at Dover, March 23, 1871.*"

By this act, the money or other property of a married woman living in a state of separation from her husband, and which had not been mixed with his, should not be his or liable for his debts so long as they remained separate and she was not supported by him; but it might be subjected to her debts while so separated from him by suit against her alone; and she might sue alone with respect to it. This is entirely consistent with the idea of exclusive ownership. The husband was not liable for these debts, unless it was his fault that they separated, then he was liable for the whole of them. This act is the first provision for the right of a married woman to bring a suit at law in her own name: but such right is confined, in terms, to debts contracted and liabilities incurred to her, whilst her separation continues. The right given is reasonable, in view of the features of the act—the faculty or power attends the provision for the separate property.

The last act affecting the subject in hand and necessary to be commented upon, for this case, is the one next passed, viz. that of 1873. It is in these words:

"AN ACT FOR THE PROTECTION OF WOMEN."

"SECTION 1. That the real and personal property of any female who may hereafter marry and which she shall own at the time of her marriage, or that any female now married may receive by gift, grant, devise or bequest from any person other than her husband,

shall be her sole and separate property, and the rents, issues and profits thereof shall not be subject to the disposal of her husband nor liable for his debts.

"Sec. 2. That all debts contracted before marriage by the wife, or by her authority after marriage, shall be a charge on her real and personal property, and a judgment therefor may be recovered against her in her name.

"Sec. 3. That any married woman may receive the wages of her personal labor not performed for family, maintain an action therefor in her own name, and hold them in her own right against her husband or any other person; she may deposit the same, or any other money belonging to her, in her own name in any bank, savings bank, or other institution for the safe keeping of money, subject to her sole right and authority to withdraw the same in whole or in part at any time without the consent or control of her husband, and upon the payment to her by any bank, savings bank or other institution for the safe keeping of money, or any moneys so deposited, they shall be exonerated from any further liability therefor.

"Sec. 4. That any married woman may prosecute and defend suits at law or in equity for the preservation and protection of her property as if unmarried, or may do it jointly with her husband, but he alone cannot maintain an action representing his wife's property; and it shall be lawful for any married woman to make any and all manner of contracts necessary to be made with respect to her own property, and suits may be maintained on such contracts as though the party making them was a *femme sole*.

"Sec. 5. That any married woman of the age of twenty-one years and upwards may, with the written consent of her husband, given under his hand and seal in the presence of two witnesses, dispose of her property, both real and personal, by will; but such disposal shall not affect the rights of the husband as tenant by the courtesy; and if she die intestate, her property, both real and personal, shall descend to her heirs as now provided by law, and administration and distribution shall take place accordingly, but a husband and wife, by a marriage contract executed in the presence of two witnesses before marriage, may determine what rights each shall have in the other's estates during marriage and after its disso-

lution by death, and may bar each other of all rights in their respective estates not so secured to them, and if any married woman shall die intestate without having had any lawful issue, then and in that case her husband shall be entitled to hold one-half part of all her real estate after the payment of all her just debts for and during the term of his natural life.

"SEC. 6. That any married woman may release to her husband the right to control her property, or any part of it, and to dispose of the income thereof for their mutual benefit, and may, in writing, revoke the same.

"SEC. 7. That all acts and parts of acts inconsistent with this act be and they are hereby repealed.

"*Passed at Dover, April 9, 1873.*"

The first section provides, in effect, that all the property, real and personal, which a woman has at her marriage, or which any woman then married might receive from any one except her husband, should be her sole and separate property, and the rents of her lands should not be subject to her husband's control, or to his debts.

The second provides that her debts at the time of marriage shall be a charge upon her real and personal property to be created by judgment against her in her own name. This provision is an enlargement of her liability by subjecting her to a separate suit.

The third enacts that she may receive her wages for services other than those rendered for her family, and hold and deposit them in her own right, etc.

The fourth provides that she may sue and defend suits at law for the preservation and protection of her property as if unmarried, or may do it jointly with her husband, but he cannot do it by himself: then, it is further enacted that she may make all contracts necessary, *with respect to her own property*, and may sue upon them as if she were a single woman.

The other sections provide that, with her husband's consent she may make a will; that nothwithstanding, he shall have his right as tenant by the curtesy. There is a further provision for a marriage contract and for legalizing it, and one to give the husband one-half his wife's realty for life, if the wife have never had any lawful issue: and another which was in part unnecessary, and in

other part is, in a legal sense, unintelligible. The one next to the last provides that the wife may release to her husband the most valuable of the foregoing provisions, for their mutual benefit; but may revoke such release.

The first section of the last mentioned act was stricken out by the act of 1875 (15 vol. of the laws, 289) and the following substituted for it, " That the real and personal property of any married woman which has been heretofore acquired, is now held, or which she may hereafter acquire in any manner whatsoever from any person other than her husband, shall be her sole and separate property, and the rents, issues and profits thereof shall not be subject to the disposal of her husband, or liable for his debts." By this all the property, present and prospective, of a married woman, is her separate property, and beyond the control of her husband or his creditors. There are other provisions of the act, but it is not material to speak of them here.

I have now given you the law with respect to married women, according to the common law system, and the provisions of the statutes of the State modifying that law. The question is whether the status of the plaintiff in this action, is such as to authorize her to bring this action. If it is not, then clearly she is not entitled to recover from the defendant.

While it is true as a general proposition that statutes in derogation of, or repugnancy to, the common law, are to be construed strictly, and nothing is to be intended in aid of them, except what is clearly imported by their language; yet, where they are of a remedial character (as the acts in question must be taken to be) the rule does not so rigidly apply. But at the same time, the language of such acts, where there is any bearing upon the question, is not to be wrested from its connection, or an imaginary meaning given to it, to make it subserve the ends of free interpretation.

The act first passed clearly gives no right to a married woman to sue in a court of law at all. That of 1871 gives the right to sue, only to married women living in a state of separation from their husbands. The statute of 1873 by the third section gives a married woman the right to sue for wages earned by her outside of her family; and the fourth gives her the right to sue and defend alone, at law or in equity, for the preservation and protection of

her property, or she may join her husband in the action. She is also allowed to make all necessary contracts with respect to her own property, and to sue upon them as if she were single. There is not any other clause or expression which gives a married woman the right to sue without her husband, as a joint plaintiff, to be found in our statute book. (I may say, that the provision giving a married woman the right to sue in equity with respect to her separate property without her husband, was unnecessary.) Where then, is the law which supports the action brought in this case? The plaintiff is not suing for wages earned by her while living apart from her husband, for it does not appear that since her marital life commenced, she has ever lived otherwise than with him: nor for debts contracted and liabilities incurred to her during separation: nor for the preservation and protection of her property; nor for the breach of any contract necessary to be made and which she had made with respect to such property. If there are any other causes of action for which she may sue except those I have mentioned, I have failed to discover them, in reading the several acts mentioned. Clearly then, if the plaintiff's case cannot be brought within some one or more of those provided for, her suit cannot be sustained; for the Courts of this State are not yet open for the prosecution of whatever suits a married woman chooses to bring.

The claim of the plaintiff, as set forth in the declaration, is of three kinds. One is on an alleged special agreement to buy the goods of her husband at the constable's sale for her benefft—that is, they to be her's when she paid for them ; as they were afterwards sold by the defendant, she claims the difference in the respective prices, being the sum of $820.12, the goods having been bought for $459.00 in November, 1875, and sold for $1,279.12 the 16th of December, 1879. Another is for her work and labor alleged to have been performed for the plaintiff from the 25th of March, 1876 till the 28th of December, 1879, when her husband ceased to occupy the premises which the defendant, from said first mentioned day, had held as tenant under Mr. Henry du Pont. These services she estimates as worth seven dollars a week all that time. The remaining item of claim is for poultry, butter, eggs and other country products which she testifies were furnished to the defendant and his family for their diet during all the period afore-

said : if I recollect her testimony the value of these articles, as supplied in the average every week, was $3.00. The service of the defendant upon the farm occupied by her husband with his family, was testified to by another witness besides the plaintiff, as was also delivery at times of the farm products, by one also speaking on her side. She claims interest upon these items. She supports her claim for the difference in the sale of the goods at the several times, by what is claimed as proof of her ownership, that is, that the defendant at the constable's sale proclaimed that he was bidding off the property for her benefit and not his own.

In reply to all the above the defendant answers by admitting his declarations at the constable's sale, and that it was understood she should have the goods when she paid for them; but he insists that she never did pay for them, and therefore acquired no title to them. He admits delivery of farm products, that is marketing, to him; but says, it was oftener done by her husband than her; and he does not dispute that she performed upon the farm the services of a farmer's wife. He sets up, however, to these different claims, the following defences. With respect to the first claim—that of the difference—that having failed to pay for the goods sold, she had no title to them : that the payment claimed by her through the delivery of marketing, and the performance of work and labor for him, have no foundation in contract with her of any kind. In support of the latter objection, he has proved before you, and they are in evidence, and being in writing cannot be gainsaid for what they are, four different agreements between the husband and the plaintiff and himself by which such husband agreed to work the aforesaid farm and find all the labor, including his own that of his family, necessary therefor, for the sum of one hundred dollars for the first year, he being allowed the privileges set forth therein. Afterwards the sum was lowered to fifty dollars a year upon the defendant's representation, which he has produced his memorandum before you to establish, that he was losing money by holding the farm.

It is not pretended by the plaintiff that any contract was ever actually made between her and the defendant about paying for these goods in any other way than with money—she, at the time she applied to the defendant to buy them in at the sale, expecting, as she told him, according to his testimony, to receive about one thousand

dollars upon some claim she had in Kent, or in the hands of her lawyer there: but she asks you to infer such a one from the fact of the work done at the farm and the marketing delivered. This is opposed by the defendant, who points to the agreements before mentioned as showing that the work done by her was part of the work of the family upon the place, stipulated for by them, and what his rights were in the matter of sale of marketing. He claims that the marketing delivered him belonged to him as much as the grain and hay raised on the land; that as none of it was paid for, the groceries, etc., provided for in the agreements were necessarily paid for by sales to other persons. It is not pretended on the plaintiff's part, that all the marketing taken from the farm was delivered to the defendant.

The learned counsel for the plaintiff objected strongly to the introduction of these agreements between her husband and the defendant in evidence before you; but the Court admitted them, and we think them proper to be submitted to you and instruct you to consider them as part of the testimony which you are to deliberate upon.

And now, with respect to those agreements, we have to say to you that it was perfectly competent for Isaac Engle Valentine and the defendant to make them, and there is no more ground for their exclusion because the former is her husband, than if they being relevant testimony, had been made by any one else. The husband had the right to make them, and to stipulate for the services of his family including his wife: for notwithstanding the legislation quoted, the husband is still the head of his household, the several members of which are under his lawful control. Whatever therefore a wife does, in the performance of the duties devolving upon her as such (as all of you no doubt know what they are in the case of a farmer's wife in good health) cannot be looked upon otherwise than as her wifely service, for which her best compensation must always be the consciousness that she has done her part. No contract to pay for them, can ever be implied against a landlord; but can only arise by express engagement.

I know of nothing else to be said in explanation of the case before you; for I am quite sure you are able to see exactly what it is. The right of the plaintiff to sue upon the facts presented, is a

27

question of law for the Court; and we say to you, that the plaintiff has not shown a case which brings her within any one of the enabling clauses of the married woman legislation, as I have cited them to you.

Verdict for defendant.